E-FILED
Tuesday, 15 March, 2022  12:39:46 PM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION

| | | |
|---|---|---|
| WILMA MICHELLE DEWITT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 20-cv-3329 |
| | ) | |
| KILOLO KIJAKAZI,[1] | ) | |
| Acting Commissioner of | ) | |
| Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

TOM SCHANZLE-HASKINS, U.S. MAGISTRATE JUDGE:

Plaintiff Wilma Michelle Dewitt appeals from the denial of her application for Social Security Disability Insurance Benefits (Disability Benefits) under Title II of the Social Security Act.  42 U.S.C. §§ 416(i) and 423.  This appeal is brought pursuant to 42 U.S.C. § 405(g).  Dewitt filed Motion for Summary Judgment (d/e 16).  The Defendant Commissioner filed a Motion for Summary Affirmance (d/e 19).  Dewitt file Plaintiff's Reply to Commissioner's Memorandum in Support of Motion for Summary Affirmance (d/e 20).  The parties consented to proceed before this Court.

Consent to the Exercise of Jurisdiction by a United States Magistrate Judge

---

[1] The Court takes judicial notice that Dr. Kilolo Kijakazi, Ph.D., is now the Acting Commissioner of Social Security.  As such, he is automatically substituted in as the Defendant in this case.  Fed. R. Civ. P. 25(d). The Court refers to Acting Commissioner Kijakazi as "Commissioner."

and Reference Order entered May 14, 2021 (d/e 13).  For the reasons set forth below, the Decision of the Commissioner is affirmed.

BACKGROUND

Dewitt was born March 25, 1973.  She completed high school and previously worked as a convention and billing manager, and a billing clerk.  She filed her application for Disability Benefits on January 8, 2019.  She alleged she became disabled on October 4, 2018 (Onset Date).  Dewitt last met the requirements for insured status for Disability Benefits on December 31, 2019 (Last Date Insured).  Dewitt suffered from the severe impairments of lumbar and cervical degenerative disc disease, osteoarthritis of the left knee, history of right knee replacement, history of right hip surgery, right shoulder arthritis, right carpal and cubital tunnel syndrome post-surgical release with development of complex regional pain syndrome, fibromyalgia, small airways disease, obstructive sleep apnea, nonischemic cardiomyopathy, obesity, bipolar disorder, anxiety, and posttraumatic stress disorder (PTSD).  She also suffered from histoplasmosis.  R. 13, 16, 46, 68, 79-83, 302.

## STATEMENT OF FACTS

### Evidence presented before the Evidentiary Hearing[2]

On October 1, 2018, Dewitt saw pulmonologist Dr. Gaurav Sangwan, M.D.  Dewitt used a BiPAP machine at night to address her sleep apnea.[3]  She reported that her daytime symptoms improved significantly with the BiPAP and denied any significant shortness of breath.  She had a history of congestive heart failure with an ejection fraction of approximately 47 percent.  R. 831.  On examination, her lungs were clear to auscultation with no wheezes and crackles.  R. 835.  Dewitt took a pulmonary function test and a 6-minute walk test during this office visit.  At the time, she measured 66 inches tall and weighed 233 pounds.  Her best forced vital capacity (FVC) in the pulmonary function test was 2.90 liters of air, and her best forced expiratory volume in one second (FEV1) was 2.43 liters.  R. 1981.  The test did not show evidence of obstruction.  R. 835.  During the 6-minute walk test, Dewitt's oxygen saturation dropped to 90 precent after a third of the test and stayed there until the end of the test when the saturation rose to 91 percent.  She kept walking throughout the test.  R. 1991.  The test showed good exercise capacity and no hypoxemia.  Dr.

---

[2] Dewitt only challenges the ALJ's treatment of her breathing impairments and her impairments in her right upper extremity in her Motion for Summary Judgment.  The Court, therefore, limits statement of facts to evidence related to those two issues.

[3] A BiPAP machine is a bilevel positive airway pressure machine used to treat sleep apnea.

Sangwan assessed obstructive sleep apnea and reactive airway disease and advised Dewitt to abstain from smoking.  R. 835.

On January 18, 2019, Dewitt saw Dr. John M. Furry, M.D.  Dewitt complained of pain in her back, right shoulder, and both legs.  She described the pain as constant, cramping, burning, and throbbing.  R. 819. An x-ray of the right shoulder showed no acute osseous abnormality.  R. 818.  Dr. Furry ordered physical therapy on Dewitt's shoulder.  See R. 772.

On January 25, 2019, Dewitt saw a physical therapist for an initial evaluation.  She reported right shoulder pain for five years that radiated down her right arm into her hand.  A nerve conduction study showed entrapped median and ulnar nerves.  Dewitt was also easily stressed and when she was stressed, she shrugged her shoulders, which caused puffiness about her trapezius muscles and seemed to increase her symptoms.  Dewitt also reported headaches with strenuous activity.  R. 772.  On examination, she had decreased range of motion and strength in her right shoulder.  She also had positive special tests on the right including Tinel's sign at the wrist.[4]  All special tests were negative on the left.  Dewitt

---

[4] The special tests consisted of diagnostic tests and signs of impairment in the right upper extremity. Tinel's sign is a sign that indicates the existence of carpal tunnel syndrome.  See Dorland's Illustrated Medical Dictionary (32nd ed. 2013) (Dorland's), at 1716.

also had poor posture and tenderness to palpation in multiple muscles.  R. 773, 1217.

On February 1, 2019, Dewitt began a course of physical therapy for her right shoulder with sessions continuing until March 6, 2019.  R. 1222-30.

On February 6, 2019, Dewitt saw surgeon Dr. Darr Leutz, M.D., for carpal tunnel syndrome.  An EMG study showed moderately severe carpal tunnel syndrome on the right and mild carpal tunnel syndrome on the left. Dewitt had symptoms of numbness, tingling, and pain for seven years.  She had been wearing a splint on the right side and took tramadol for pain.  She rated her pain at 7/10. R. 1116.  On examination, Dewitt had no swelling in her wrists; she had abnormal sensation in all five fingers of her right hand and tenderness; her range of motion was normal in her hands; she had pain with range of motion; she had positive Tinel's test and Phalen's test[5] and she had 3/5 grip strength in her right hand. R. 1117.  Dr. Leutz discussed surgery with Dewitt.  R.1118.

On February 12, 2019, Dewitt had a physical therapy session for her right shoulder.  She reported that her pain was 2/10 and she noticed significant improvement in her function at home.  R. 1227.

---

[5] Phalen's test is a diagnostic test that indicates carpal tunnel syndrome.  See Dorland's, at 1714.

On February 15, 2019, Dr. Leutz performed right carpal tunnel release surgery on Dewitt.  R. 1025.

On March 1, 2019, Dewitt had a physical therapy session for her right shoulder.  She met the goal of exhibiting full active range of motion of her right shoulder.  Dewitt, however, rated her pain at 4/10, and reported that the pain went from her right shoulder to her right carpal tunnel.  She reported numbness and tingling in the first three fingers of her right hand.  R. 1330.

On March 6, 2019, Dewitt had a physical therapy session.  She reported a severe migraine headache after the last session, but her shoulder felt better.  She had full range of motion in the flexion and abduction of her right shoulder.  She stopped physical therapy on her shoulder to begin post-operative physical therapy on her right hand.  R. 1239-40.

On March 6, 2019, the physical therapist conducted an initial evaluation of Dewitt's right hand.  Dewitt reported continued numbness, tingling, and pain from her right elbow down to her wrist and shooting pain down to the first three fingers.  She had increased sensitivity throughout her right hand and a decreased range of motion in her right fingers and wrists and a weak grip.  She rated her a pain at best 4/10 and at worst

6/10.  The pain was worse with elevating her right upper extremity, driving, and pronation.  R. 1219.  On examination, her sensation was within normal limits in her right upper extremity generally but absent to light touch with monofilament in her left forearm/hand.  Dewitt was mildly tender to palpation over the surgical scar, thanar imminence, and metacarpophalangeal joints of the second through fifth fingers (greater over the second and third metacarpophalangeal joints).  She had decreased strength in the right hand and slight swelling of the right wrist and metacarpophalangeal joints of the right hand.  R. 1220.

On March 29, 2019, Dewitt had an MRI taken of her right shoulder. She had mild degenerative changes in the acromioclavicular (AC) joint, subscapularis tendinosis, but no full-thickness or high-grade partial thickness rotator cuff tendon tear.  R. 1006-07.

On April 10, 2019, Dewitt saw Dr. Leutz.  Dewitt said she was "doing horrible" and reported still having pain and numbness.  She received no relief from physical therapy or prescription of Lyrica and rated her pain at 4/10.  R. 1102.  On examination, her left wrist was normal; she had abnormal sensation in the first through fourth digits of her right hand; she had no effusion in her right wrist or hand; she was tender in the volar aspect; she had normal range of motion with pain; her wrists tests were

normal and she had 2/5 grip strength.  R. 1103.  Dr. Leutz assessed

brachial plexopathy and carpal tunnel syndrome of the right wrist and

prescribed more physical therapy.  R. 1104.

On April 16, 2019, Dewitt completed her post-operative physical

therapy sessions for her right wrist.  She showed improvement in active

range of motion of her right wrist and hand, but no improvement in her

radicular symptoms.  R. 1241.

On April 17, 2019, Dewitt was seen at the Passavant Area Hospital

Pain Clinic (Pain Clinic).  The notes from the visit state that the right

shoulder MRI showed osteoarthritis and tendinosis, but no rotator cuff tear.

Dewitt reported that Lyrica helped with the pain.  She received a right

shoulder subacromial intra-articular steroid injection due to right shoulder

osteoarthritis pain.  R. 1301.

On April 22, 2019, Dewitt saw state agency physician Dr. Vittal

Chapa, M.D., for a consultative examination.  She reported right shoulder

pain and stated that she had right carpal tunnel surgery and was still

receiving physical therapy for the right hand.  R. 1047.  On examination,

Dewitt had no motor weakness or muscle atrophy; her sensation was intact

in her lower extremities; she was tender all over with no specific trigger

points; her right-hand grip was 4/5 and her left-hand grip was 5/5.  Dewitt

could perform fine and gross manipulations with both hands and had full range of motion in all her joints except her right shoulder.  R. 1048-49.

On April 30, 2019, Dewitt was evaluated for additional physical therapy for right carpal tunnel syndrome and brachial plexopathy.  She reported numbness and tingling throughout her right upper extremity and burning pain in her wrist.  The pain was 6/10 at rest and 8/10 at worst, and was worse with activity including driving, washing dishes, and cleaning the house.  Her right hand also felt very hot or very cold at times.  R. 1200.  On examination, her range of motion of the right upper extremity was limited due to pain; her right upper extremity had 75 percent of the range of motion of the left, except the right had 50 percent of range of flexion of the left upper extremity.  The 75 percent range of motion on the right included hand extension, radial deviation ulnar deviation, finger extension, and grip.  Special tests Roo's, Adson's, and Allen's were all positive on the right.[6]  The right upper extremity was tender to palpation, particularly the metacarpophalangeal joints.  R. 1201.  Dewitt began another course of physical therapy.  R. 1202.

---

[6] Adson's test and Roos test are tests for thoracic outlet syndrome.  Thoracic outlet syndrome includes compression of the brachial plexus nerve trunks that can cause weakness and pain in the arms and hands.  See Dorland's, at 1850, 1885, 1898.  Allen's test is a test for occlusion of the ulnar or radial arteries.  See Dorland's, at 1885.

On May 20, 2019, state agency physician Dr. Frank Mikell prepared a Physical Residual Functional Capacity Assessment of Dewitt.  Dr. Mikell opined that Dewitt could lift 20 pounds occasionally and 10 pounds frequently, stand and/or walk for six hours in an eight-hour workday, sit for six hours in an eight-hour workday, and was limited in her ability to push or pull with her right upper extremity due to decreased range of motion in her right shoulder.  Dr. Mikell said Dewitt could occasionally stoop, kneel, crouch, crawl, and climb ramps, stairs, ladders, ropes, and scaffolds; frequently balance; and she must avoid concentrated exposure to extreme cold and heat, wetness, and humidity.  Dr. Mikell opined that Dewitt was limited to frequent fine and gross manipulations with her right hand.  He found no other functional limitations.  R. 187-89.

On May 29, 2019, Dewitt saw Dr. Leutz.  She said she was 40 percent better since her last visit and put her pain at 4/10.  On examination, her left upper extremity was normal; her right first, second, and third fingers had abnormal sensation; she had no effusion; she had tenderness in the volar aspect on the right; she had normal range of motion in her right extremity with pain; she had positive Tinel's test and Phalen's test on the right; her right grip strength was 3/5; she had no instability in her right

upper extremity.  Dr. Leutz ordered another EMG study of Dewitt's right upper extremity for persistent carpal tunnel.  R. 1095-96.

On May 29, 2019, Dewitt was also seen at the Pain Clinic.  She reported that she injured her back while gardening.  Her back was improving and she surmised that she pulled a muscle.  She reported a slight improvement from the injection in her right shoulder.  R. 1291.

On June 7, 2019, Dewitt ended her physical therapy.  The therapist noted no changes since the beginning of this round of physical therapy on April 30, 2019, and the therapy was discontinued.  R. 1214.

On June 18, 2019, Dewitt saw Dr. Edward Trudeau, M.D., for an EMG study of her upper extremities.  On examination, Dewitt had marked, diffuse weakness in her right upper extremity compared to the left; she had reduced reflexes in the right compared to the left; she had no atrophy on either side; she had hypesthesia in both hands in a glove-type distribution; she had discomfort to palpation of the right shoulder girdle with limitation of motion, tenderness, and swelling over the supraclavicular fossa one either side, and diffuse hypesthesia in the upper right extremity compared to the left.  R. 1134.  The EMG study showed bilateral moderately severe carpal tunnel syndrome; moderately severe cubital tunnel syndrome on the right; mild right brachial plexopathy, medial cord lesion, consistent with

neurogenic thoracic outlet syndrome, and "likely part of a double crush with the above;" and no evidence of cervical radiculopathy.  R. 1136.

On July 17, 2019, Dewitt saw Dr. Jianjun Ma, M.D.  Dewitt complained of continued numbness and tingling in her right thumb and fingers and rated her pain at 6/10.  The pain was intermittent, sharp, and burning.  On examination, she had decreased sensation in the median and ulnar nerve distributions.  Tinel's sing, Durkan's test, and Phalen's tests were positive.[7]  Dr. Ma also reviewed the June 18, 2019 EMG study.  R. 1088.   Dr. Ma assessed right carpal tunnel syndrome and right cubital tunnel syndrome and recommended a second surgery.  Dewitt agreed to the second surgery.  R. 1087.

On August 7, 2019, Dr. Ma performed a right carpal tunnel release; median; median nerve neurolysis; hypothenar fat pad flap transfer; and right cubital tunnel release, in situ.   R. 1123-25.

On August 21, 2019, Dewitt saw Dr. Ma.  Her right hand remained swollen and stiff two weeks after surgery and she still had numbness and tingling in her right hand.  On examination, Dewitt's right hand was swollen and stiff; sensation in the median and ulnar nerve distributions were

---

[7] Durkan's test is a test for carpal tunnel syndrome.  See Szabo, Slater, Farver, Stanton, and Sharman, The value of diagnostic testing in carpal tunnel syndrome - PubMed (nih.gov), viewed February 28, 2022.

decreased. Dr. Ma told Dewitt to continue her at-home exercise program and ordered physical therapy.  R. 1074.

On August 26, 2019, Dewitt went to physical therapy for an initial evaluation.  She reported constant pain, numbness, and tingling in her whole right hand and a popping in her right elbow with flexion and thumb popping with pain and occasional sticking.  She rated her pain at 6/10 at best and 10/10 at worst and said she could not grip or lift with her right hand, and she was severely limited in putting on makeup and combing her hair.  R. 1506.  On examination, Dewitt had limited range of motion in her right elbow, wrist, and fingers and limited strength in her right elbow, wrist, and fingers ranging from 2/5 to 3+/5.  R. 1507-08.

On September 9, 2019, state agency physician Dr. Phillip Galle, M.D., prepared two Physical Residual Functional Capacity Assessments of Dewitt, one for the period from the Onset Date to August 6, 2019, and one from August 7, 2019 to August 7, 2020.  Dr. Galle opined that from the Onset Date to August 6, 2019, Dewitt could lift 20 pounds occasionally and 10 pounds frequently, stand and/or walk for six hours in an eight-hour workday, sit for six hours in an eight-hour workday, and had limited ability to push or pull with her right upper extremity due to decreased range of motion in her right shoulder.  Dr. Galle said Dewitt could occasionally

stoop, kneel, crouch, crawl, and climb ramps, stairs, ladders, ropes, and scaffolds; frequently balance; and she must avoid concentrated exposure to extreme cold and heat, wetness, and humidity.  Dr. Galle opined that Dewitt was limited to frequent gross manipulations with her right hand.  Dr. Galle found no other functional limitations through August 6, 2019.  R. 204-06.

Dr. Galle found that from August 7, 2019 to August 7, 2020, Dewitt could lift 20 pounds occasionally and 10 pounds frequently, stand and/or walk for six hours in an eight-hour workday, sit for six hours in an eight-hour workday, and was unlimited in her ability to push or pull with her right upper extremity.  Dr. Galle said Dewitt could occasionally stoop, kneel, crouch, crawl, and climb ramps, stairs, ladders, ropes, and scaffolds; frequently balance; and she must avoid concentrated exposure to extreme cold and heat, wetness, and humidity.  Dr. Galle opined that Dewitt was limited to frequent gross manipulations with her right hand, but found no other functional limitations through August 7, 2020.  Dr. Galle assumed the August 7, 2019 surgery would resolve Dewitt's limitations with her right upper extremity.  R. 206-09.

On October 1, 2019, Dewitt attended her last physical therapy session since the August 26, 2019 evaluation.  Dewitt reported that her

symptoms were worse.  She had continued pain, numbness, and tingling in her right upper extremity and her surgery scars were hypersensitive.  She could not tolerate anything touching her ulnar nerve surgery scar.  She still rated her pain at 6/10 at best and 10/10 at worst.  On examination, Dewitt's range of motion in her right upper extremity improved since August, but her strength remained largely unchanged.  She believed her right shoulder was causing most of her pain.  Further physical therapy sessions were put on hold.  R. 1952-53.

On October 1, 2019, Dewitt also took a pulmonary function test.  At that time, she measured 66 inches tall and weighed 217 pounds.  Her best FVC was 2.77 liters and her best FEV1 was 2.23 liters.  R. 1979.

On October 2, 2019, Dewitt saw advanced practice nurse (APN) Carly Ellison, NP, APRN, to establish care.  Dewitt wanted a second opinion on treatment of her right upper extremity.  On examination, she had positive Tinel's sign on the right wrist; she had tingling at the right elbow and sensory changes in her right arm and hand.  Ellison referred Dewitt to neurologist Dr. Todd Elmore, M.D., for her right upper extremity impairments.  R. 2186-87.

On October 15, 2019, Dewitt took a pulmonary function test.  At the time, she measured 66 inches tall and weighed 220 pounds.  Her best FVC

was 3.09 liters and her best FEV1 was 2.52 liters.  R. 1977.  Dewitt also took a 6-minute walk test that day.  Her oxygen saturation dropped to 86 percent in the middle of the test.  She received supplemental oxygen and rested in the middle of the test and her saturation went back up to 97 percent.  She then completed the test.  Her oxygen saturation stayed at 95 percent or higher.  R. 1992.

On October 16, 2019, Dewitt saw neurologist Dr. Elmore.  Dewitt reported pain in her right upper extremity and pain from her neck down into her right arm.  Dr. Elmore noted swelling and redness.  R. 2229-30.  On examination, Dewitt had normal strength throughout and normal sensation. Dr. Elmore assessed a possible infection in her right wrist and possible cervical radiculopathy and prescribed an antibiotic and an MRI of Dewitt's cervical spine.  R. 2231-33.

On October 23, 2019, Dewitt saw Dr. Ma.  She reported continuing right-hand numbness and tingling and said she woke up at night due to numbness and tingling.  Her incision areas were very sensitive.  On examination, Dr. Ma saw no evidence of infection.  Dewitt's sensation to median and ulnar nerve distributions in her right extremity were diminished. Dr. Ma suspected complex regional pain syndrome and recommended

additional occupational therapy.  Dr. Ma also instructed Dewitt to continue her at-home exercise program.  R. 2089.

On October 25, 2019, Dewitt took another 6-minute walk test.  Her oxygen saturation dropped in the middle of the test to 90 percent, and she continued the test to completion without stopping and without any supplemental oxygen.  By the end of the test, her oxygen saturation was up to 96 percent.  R. 1993.  Dewitt also had a chest CT scan performed on this date that showed small airways disease, no definite CT evidence of interstitial lung disease, and a possible pulmonary infection.  R. 1965.

On November 14, 2019, Dewitt was evaluated for occupational therapy.  She rated her pain in her elbow and hand at 6/10 and said she had severe limitations in driving, grocery shopping, working, cleaning, cooking, and recreational activities.  She needed minimal assistance in dressing, toileting, and eating; and moderate assistance in bathing and grooming.  On examination, Dewitt's right hand had one-third of the normal gross grasp, hook fist, and straight fist; her right thumb could not touch the base of her right small finger; her left hand had full grasps and opposition; her right hand had decreased strength compared to her left; she had decreased range of motion in her right elbow and wrist. Dewitt could not tolerate light pressure to the medial elbow and volar wrist.  The

occupational therapist recommended 12 weeks of occupational therapy.  R. 1929-33.

On November 20, 2019, Dewitt saw Dr. Elmore.  Her pain was worse and ran from her neck down into her right shoulder and into her right arm. The pain also ran up into the back of her head.  R. 2215.  On examination, Dewitt had limited range of motion in her cervical spine and numbness running down her right arm; she had normal strength, normal muscle bulk and tone, and normal sensation.  The swelling was reduced in her wrist after taking the antibiotics.  Dr. Elmore assessed cervical radiculopathy and ordered an MRI of her cervical spine.  R. 2217-19.

On December 4, 2019, Dewitt saw Dr. Ma.  Dewitt reported continuing pain, numbness, and tingling in her right hand and stated driving and buttoning her pants were difficult.  The numbness and tingling woke her up at night and she rated that pain at 4/10.  On examination, her incisions were healing, she had decreased sensation to her right median and ulnar nerve distributions, and she had trouble making a fist.  Dr. Ma assessed complex regional pain syndrome in the right upper extremity and said that recuperation would take up to a year.  Dr. Ma recommended continued therapy and continued at-home exercise program.  R. 2067.

On December 12, 2019, Dewitt saw infectious disease specialist Dr. Steven O'Marro, M.D.  Testing demonstrated that Dewitt had a histoplasmosis infection in her lungs.  On examination, Dewitt's lungs were clear to percussion and auscultation; she had 4/5 strength in upper and lower extremities; and her sensation was intact to light touch.  Dr. O'Marro prescribed itraconazole by mouth for six months.  R. 2056-57.

On December 20, 2019, Dewitt went to the emergency room.  She reported right side weakness, tremor, and numbness, and said she had a headache the day before.  She also started taking itraconazole the day before.  On examination, she had 3/5 strength in her right upper and lower extremities and 5/5 strength in her left upper and lower extremities.  Dewitt had no dysarthria or aphasia.  R. 2267-68.  A stroke resident examined Dewitt and noted inconsistent exam findings of all four-extremity weakness, forced facial droop when changed sides, and discrepancies in sensation while testing.  R. 2279.  A CT scan of her brain showed no intracranial process or abnormality.  R. 2270-71.  She was discharged.  The physicians recommended stopping the itraconazole and consider a psychiatric evaluation.  R. 2280.

On January 2, 2020, Dewitt attended an occupational therapy session.  She reported that her right arm was better than at the time of the

October 1, 2019 evaluation and rated her pain at 4/10 at the time of the session and 10/10 at the worst.   She reported severe limitations driving, grocery shopping, working, cooking, and engaging in recreational activities; and moderate limitation in cleaning.  She needed moderate assistance bathing and minimal assistance dressing, toileting, grooming, and eating. R. 1919-20.  Dewitt had slightly improved, but still limited, active range of motion in her right elbow, wrist, and shoulder.  She had slightly improved, but still reduced, right hand and grip strength.  She was able to tolerate light pressure on medial elbow and volar wrist and had met her goals to increase her range of motion in her right hand to within 50 percent of the range of motion in her left hand, to put on a pullover sweater, and to manage her transportation needs to get from one place to another, but she had not met her goal to drive.  She was making progress on her goals to decrease her pain to allow increased participation in functional activities, to become independent in her DADLs, to increase her range of motion to within normal limits; to make a full return to functional/recreational activities and exercises; to push up on her hands from the bathtub or chair; and to dress herself.  The therapist stated that Dewitt was progressing toward her goals and would benefit from further occupational therapy.  R. 1920-23.

On January 3, 2020, Dewitt had a cervical MRI taken which showed a small disc protrusion at C5-C6 with no convincing indentation or signal abnormality, mild spinal canal stenosis at C5-C6, and mild bilateral foraminal stenosis at C4-C5.  R. 2211-12.

On January 3, 2020, Dewitt saw Dr. Elmore.  Dr. Elmore noted that the cervical MRI showed a bone spur at C5-C6 "but nothing too bad."  On examination, Dewitt's musculoskeletal exam showed normal range of motion; she also had normal range of motion in her neck; she had normal strength; her strength was 5/5 throughout; her sensory exam was normal. Dr. Elmore recommended that Dewitt follow up with pain management therapy with respect to her neck and arm pain.  R. 2204-07.

On January 16, 2020, Dewitt saw APN Ellison.  On examination, Dewitt had decreased grip strength and resistance to right arm/hand/grip. R. 2179.  Ellison completed paperwork for a disability parking placard. Ellison marked on the form indicating that Dewitt was permanently disabled; she was severely limited in her ability to walk due to arthritic, neurological, oncological, or orthopedic condition; and could not walk 200 feet without stopping to rest.  Ellison listed Dewitt's debilitating diagnoses as muscle weakness and carpal tunnel syndrome.  Ellison listed a third diagnosis, but her handwriting is illegible.  R. 294.

On January 30, 2020, Dewitt attended an occupational therapy session.  She reported that she was trying to do more functional activities.  She rated her pain at 5/10 at the time of the session and 6/10 at the worst.  Dewitt reported severe limitations driving, grocery shopping, working, cooking, and engaging in recreational activities; and moderate limitation in cleaning.  She needed minimal assistance dressing and eating, and could independently perform toileting, grooming, and bathing.  R. 1924-25.  She had slightly improved, but still limited, active range of motion in her right elbow, wrist, and shoulder and she had slightly improved, but still reduced, right hand and grip strength.  Dewitt was able to tolerate light pressure on medial elbow and volar wrist.  The status of Dewitt meeting her goals in therapy remained the same since the January 2, 2020, session and the therapist stated that Dewitt was progressing toward her goals and would benefit from further occupational therapy.  R. 1925-28.

On February 27, 2020, Dewitt had a pulmonary function test.  At the time, Dewitt measured 67 inches tall and weighed 229 pounds.  Her best FVC was 3.05 liters and her best FEV1 was 2.48 liters.  R. 1971.  Dewitt also took a 6-minute walk test that day.  Her saturation of oxygen dropped to 90 percent in the middle of the test and went up to 96 percent by the end of the test.  Dewitt kept walking throughout the test. R. 1993.

## The Evidentiary Hearing

On June 4, 2020, the Administrative Law Judge (ALJ) conducted an evidentiary hearing by telephone conference.  R. 53-94.  Dewitt appeared in person and with her attorney.  Vocational expert Bob Hammond also appeared.  R 55-57.

Dewitt testified that she lived with her husband in a one-story home with a basement.  She had a driver's license, but she last drove a few months before the hearing, and completed high school.  R. 67-68.

Dewitt said she could not work because she could not sit or stand for a long period.  R. 69.  She also could not walk long distances because of her difficulties breathing.  R. 73. She did not go shopping because of her inability to walk distances.  She sat on a bench in her shower and had difficulty breathing in the shower.  R. 74.  She could sit in an office desk chair for three to five minutes and she used a cane to walk longer distances and while walking in her yard.  R. 77.

Dewitt testified that she had also lost feeling and function in her index and middle fingers and part of her thumb on her right hand.  R. 69.  She could not use buttons on her clothing and had difficulty pulling up and down clothing with elastic waist bands.  She could not put on makeup and her husband cut her food for her.  R. 77-78.

Vocational expert Hammond then testified.  The ALJ ask Hammond

the following hypothetical question,

> Q Okay. All right. Let me then ask you some hypothetical
> questions. Let's start with -- obviously concerning past work.
> Let's start with the exertional capacity limited to light work, with
> no climbing of ladders, ropes, or scaffolds. Other postural
> functions can be performed occasionally. Need to avoid
> environmental hazards, such as unprotected heights and
> dangerous machinery. Occasional pushing or pulling with the
> upper extremities. All manipulative functions would be
> bilaterally could be performed frequently. In other words,
> reaching, handling, fingering, feeling, all frequent for this
> hypothetical.  Need to avoid concentrated exposure to extreme
> temperatures, to wetness, to humidity, and pulmonary irritants.
> Let's start with those limitations. How would the past work be
> affected by that?

R. 83-84.  Hammond said that the person could perform Dewitt's past work

as a billing clerk and as a convention and billing manager both as she

performed the work and as performed generally in the national economy.

R. 84.

The ALJ asked Hammond to consider the same hypothetical person

except changing the base exertional limitation from light to sedentary work.

Hammond agreed the person could perform the billing clerk job as

generally performed in the national economy, but not as Dewitt performed

the job.  The person would not be able to perform the manager job.  R. 84-

85.

The ALJ added an additional limitation to the hypothetical question about the person who could perform a limited range of sedentary work:

> Q Okay. And these are both -- well, one is semiskilled and one skilled. So if one did have moderate deficits with concentration, persistence, and pace, and therefore limited to understanding simple and routine instructions, to making simple work-related decisions, and to performing simple and routine tasks on a sustained basis with little or no change in work settings or duties, that limitation by itself would eliminate all past work. Correct?

R. 85.  Hammond agreed that such a person could not perform either of Dewitt's past relevant jobs.  R. 85.  Hammond opined that such a person with Dewitt's age, education, and work experience who was limited to sedentary work and further limited to all the other limitations in the two quoted hypothetical questions above could perform the sedentary jobs of circuit board screener, with 135,000 such jobs in existence nationally; semiconductor bonder, with 130,000 such jobs in existence nationally; and sealer, with 90,000 such jobs in existence nationally.  R. 86.

Hammond opined that if the person in the hypothetical was limited to the sedentary work and occasional handling, fingering, and feeling she would not be able to work.  R. 90-91.  The person also could not be absent for more than 1 day in the first 90 days of work and could not be absent for more than 10 days in 12-month period.  R. 92.  The hearing concluded.

## THE DECISION OF THE ALJ

The ALJ issued his decision on June 19, 2020.  R. 13-47.  The ALJ followed the five-step analysis set forth in Social Security Administration Regulations (Analysis).  20 C.F.R. §§ 404.1520, 416.920.  Step 1 requires that the claimant not be currently engaged in substantial gainful activity.  20 C.F.R. §§ 404.1520(b), 416.920(b).  If true, Step 2 requires the claimant to have a severe impairment.  20 C.F.R. §§ 404.1520(c), 416.920(c).  If true, Step 3 requires a determination of whether the claimant is so severely impaired that she is disabled regardless of her age, education, and work experience.  20 C.F.R. §§ 404.1520(d), 416.920(d).  To meet this requirement at Step 3, the claimant's condition must meet or be equal to the criteria of one of the impairments specified in 20 C.F.R. Part 404 Subpart P, Appendix 1 (Listing).  20 C.F.R. §§ 404.1520(d), 416.920(d).  If the claimant is not so severely impaired, the ALJ proceeds to Step 4 of the Analysis.

Step 4 requires the claimant not to be able to return to her prior work considering her age, education, work experience, and Residual Functional Capacity (RFC).  20 C.F.R. §§ 404.1520(e) and (f), 416.920(e) and (f).  If the claimant cannot return to her prior work, then Step 5 requires a determination of whether the claimant is disabled considering her RFC,

age, education, and past work experience.  20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g), 416.960(c).  The claimant has the burden of presenting evidence and proving the issues on the first four steps.  The Commissioner has the burden at Step 5 to present evidence that, considering the listed factors, the claimant can perform some type of gainful employment that exists in the national economy.  20 C.F.R. §§ 404.1512, 404.1560(c); <u>Weatherbee v. Astrue</u>, 649 F.3d 565, 569 (7th Cir. 2011); <u>Briscoe ex rel. Taylor v. Barnhart</u>, 425 F.3d 345, 352 (7th Cir. 2005).

The ALJ found that Dewitt met her burden at Steps 1 and 2.  She had not worked from the Onset Date through the Last Date Insured.  She suffered from the severe impairments of "lumbar and cervical degenerative disc disease, osteoarthritis of the left knee, history of right knee replacement, history of right hip surgery, right shoulder arthritis, right carpal and cubital tunnel syndrome post-surgical release with development of complex regional pain syndrome, fibromyalgia, small airways disease, obstructive sleep apnea, nonischemic cardiomyopathy, obesity, recent diagnosis of histoplasmosis, bipolar disorder, anxiety, and PTSD."
R. 15-16.

The ALJ found at Step 3 that Dewitt's impairments or combination of impairments did not meet or equal a Listing.  The ALJ considered whether

Dewitt's breathing difficulties equaled Listing 3.04 for cystic fibrosis.  The ALJ noted that Dewitt's oxygen saturation dropped to 86 percent in the October 15, 2019 6-minute walk test.  Listing 3.04, however, requires two tests in a 12-month period, at least 30 days apart, in which the oxygen saturation dropped to 89 percent or lower.  Dewitt's oxygen saturation levels never dropped below 90 percent in her other 6-minute walk tests.  The ALJ, therefore, concluded that Dewitt's condition did not equal the impairment described in Listing 3.04.  The ALJ also noted that Dewitt did not have cystic fibrosis.  As a result, she needed to present evidence from a medical expert that her impairment equaled Listing 3.04.  Dewitt did not present evidence from a medical expert.  The ALJ, therefore, found that she failed to show that her condition met or equaled Listing 3.04.  R. 16.

The ALJ also considered whether Dewitt's breathing impairments equaled Listing 3.02 for chronic respiratory disorder due to any cause other than cystic fibrosis.  To meet this Listing, Dewitt needed pulmonary function tests that showed an FEV1 of 1.45 or lower and an FVC of 1.70 or lower, or she needed pulmonary function testing that showed chronic impairment of gas exchange in her lungs.[8]  None of the pulmonary function tests showed

---

[8] Listing 3.02 contains a table of required FEV1 and FVC levels for an individual based on her height and weight.  The ALJ selected the required levels for Dewitt's height and weight.

FEV1 or FVC levels this low.  The pulmonary function tests also did not

show chronic impairment of gas exchange.  The ALJ concluded that

Dewitt's breathing impairments did not meet Listing 3.02.  R. 18-19.

The ALJ then determined that Dewitt had the following RFC:

5. After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform sedentary work as defined in 20 CFR § 404.1567(a) except no more than occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching, or crawling; no climbing of ladders, ropes or scaffolds; no work-related exposure to environmental hazards such as unprotected heights or dangerous machinery; no more than occasional pushing and pulling with the upper extremities; no more than frequent reaching, handling, fingering, and feeling bilaterally; no concentrated exposure to extreme temperatures, wetness, humidity, or pulmonary irritants; a limitation to understanding simple and routine instructions, to making simple work-related decisions, and to the performance of simple and routine tasks on a sustained basis with little or no change in work settings or duties; no more than occasional interaction with supervisors or coworkers; and no interaction with the general public.

R. 23. The ALJ relied on the fact that Dewitt reported on October 1, 2018

that the BiPAP improved her daytime sleep apnea symptoms significantly;

her complaints of shortness of breath were intermittent until late 2019; her

pulmonary function tests showed no large airway obstruction; her

pulmonologist did not prescribe oxygen therapy; and, with one exception,

her 6-minute walk tests showed her oxygen saturation level stayed at 90

percent or above.  R. 44.  To address Dewitt's breathing problems in the

RFC, the ALJ included the requirement to avoid concentrated exposure to extreme cold and heat, wetness, humidity, and pulmonary irritants.  R. 43-44.

The ALJ stated that Dewitt's right carpal tunnel syndrome was the most significant problem affecting her RFC.  R. 45.  The ALJ limited Dewitt to frequent handling, fingering, and feeling to address this impairment.  The ALJ relied on Dr. Chapa's examination in which Dewitt had reduced 4/5 grip strength in her right hand but could perform fine and gross manipulations with both hands; she reported on her May 29, 2019 visit at the Pain Clinic that she engaged in gardening, and gardening required performing manipulative tasks; and her condition improved during her last occupational therapy sessions.  At the January 2, 2020, physical therapy session, Dewitt showed increased range of motion of the right shoulder, elbow, and wrist; increased right grip strength; and improved grasp and fist formation.  At the January 20, 2020, session, Dewitt required only minimal help grooming; and on January 30, 2020, Dewitt reported that she could independently perform bathing, toileting, and grooming, and needed only minimal assistance dressing and eating.  The ALJ concluded that this evidence showed Dewitt could perform handling, fingering, and feeling frequently.  The ALJ limited her left hand to frequent handling, fingering,

and feeling to avoid overuse of her left hand since the EMG study showed asymptomatic carpal tunnel syndrome in that extremity also.  R. 45.

The ALJ also relied on the opinions of Drs. Mikell and Galle.  The ALJ, however, found that the other evidence in the record required limiting Dewitt's RFC to sedentary work instead of light work.  The ALJ also discounted Dr. Galle's opinion that Dewitt would have no limitations on her ability to handle, finger, or feel after August 7, 2019.  The ALJ found that Dr. Galle assumed the second carpal tunnel and cubital tunnel surgery would resolve her limitations with her right hand, but he was mistaken.  R. 41-42.

The ALJ then found at Step 4 that Dewitt could not perform her past relevant work.  The ALJ relied on the RFC and the opinions of vocational expert Hammond.  R. 46.

At Step 5, the ALJ found that Dewitt could perform a significant number of jobs in the national economy.  The ALJ relied on the Medical-Vocational Guidelines, 20 C.F.R. Part 4040, Subpart P, Appendix 2, and the opinions of vocational expert Hammond that a person with Dewitt's age, education, work experience, and RFC could perform the representative jobs of circuit board screener, semiconductor bonder, and sealer.  The ALJ

concluded that Dewitt was not disabled from the Onset Date through the Date Last Insured.  R. 46-47.

Dewitt administratively appealed the ALJ's decision.  On October 28, 2020, the Appeals Council denied Dewitt's request for review.  The ALJ's decision then became the final decision of the Defendant Commissioner. R. 1.  Dewitt then brought this action for judicial review.

## ANALYSIS

This Court reviews the Decision of the Commissioner to determine whether it is supported by substantial evidence.  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate" to support the decision.  Richardson v. Perales, 402 U.S. 389, 401 (1971). This Court must accept the findings if they are supported by substantial evidence and may not substitute its judgment or reweigh the evidence. Jens v. Barnhart, 347 F.3d 209, 212 (7th Cir. 2003); Delgado v. Bowen, 782 F.2d 79, 82 (7th Cir. 1986).  This Court will not review the ALJ's evaluation of statements regarding the intensity, persistence, and limiting effect of symptoms unless the evaluation is patently wrong and lacks any explanation or support in the record.  See Pepper v. Colvin, 712 F.3d 351, 367 (7th Cir. 2014); Elder v. Astrue, 529 F.3d 408, 413-14 (7th Cir. 2008); SSR 16-3p, 2017 WL 5180304, at *1 (October 25, 2017) (The Social

Security Administration no longer uses the term credibility in the evaluation of statements regarding symptoms).  The ALJ must articulate at least minimally his analysis of all relevant evidence.  <u>Herron v. Shalala</u>, 19 F.3d 329, 333 (7th Cir. 1994).  The ALJ must "build an accurate and logical bridge from the evidence to his conclusion."  <u>Clifford v. Apfel</u>, 227 F.3d 863, 872 (7th Cir. 2000).

The Court finds this to be a close case but concludes that the ALJ's decision was supported by substantial evidence.  The ALJ found that Dewitt could perform a very limited range of work in the RFC finding.  The ALJ found that Dewitt could perform only a limited range of sedentary work with postural limitations, limitations to pulmonary irritants, and limitations to frequent handling, fingering, and feeling.  The only medical opinions in the file from Drs. Mikell and Galle support this RFC finding.  Drs. Mikell and Galle concluded that Dewitt could perform light work with the fewer other functional limitations than those found by the ALJ.  Dr. Chapa found that Dewitt had 4/5 grip strength but could perform all fine and gross manipulations and had full range of motion in all her joints except her right shoulder.  Dr. Chapa's findings were consistent with the limited range of sedentary work in the RFC.  The examinations of Dewitt's specialist, neurologist Dr. Elmore in 2019 and 2020 also supported the RFC finding.

Dr. Elmore consistently found full strength and normal sensation.  The ALJ also correctly noted that the January 2 and January 30, 2022, examinations by Dewitt's occupational therapist found some limited improvement in the impairments in her right arm.  Dewitt presented no contrary medical source statements or other medical opinions of her functional limitations due to her impairments.[9]  See Burmester v. Berryhill, 920 F.3d 507, 510 (7th Cir. 2019) ("This finding was more limiting than that of any state agency doctor or psychologist, illustrating reasoned consideration given to the evidence Burmester presented."); see also Best v. Berryhill, 730 Fed.Appx. 380, "There is no error when there is 'no doctor's opinion contained in the record [that] indicated greater limitations than those found by the ALJ.'").  On this record, the ALJ's finding that Dewitt could perform a limited range of sedentary work described in the RFC was supported by substantial evidence.

The RFC finding, combined with the opinion of vocational expert Hammond, provided substantial evidence to support the conclusion at Step 5 that Dewitt could perform a significant number of jobs in the national

---

[9] The ALJ also discounted APN Ellison's statement on the handicap parking placard application that Dewitt's carpal tunnel syndrome limited her ability to walk 200 feet.  The ALJ stated that carpal tunnel syndrome would not impair Dewitt's ability to walk.  R. 41.  Dewitt does not rely on Ellison's opinion to support her argument.

economy.  The decision that Dewitt was not disabled through her Last Date Insured was supported by substantial evidence.

Dewitt argues that the ALJ did not draw a logical bridge from the evidence to his findings.   Dewitt argues that the ALJ did not explain how he reached his conclusion from the evidence.  The Court disagrees.  The ALJ explained why he concluded that Dewitt's impairment of her right arm and her breathing impairments supported the RFC finding.  R. 43-45.[10] Dewitt quotes from the ALJ's decision extensively to prove that the ALJ did consider the evidence cited in the quotations.  The quotations, however, demonstrate that the ALJ considered the evidence because the ALJ set forth the quoted evidence in his decision.  The ALJ further set forth which evidence he found persuasive and led him to his conclusion.  R. 45.  Dewitt essentially asks the Court to reweigh the evidence.  This Court, however, cannot reweigh the evidence.  Jens, 347 F.3d at 212; Delgado, 782 F.2d at 82.

---

[10] Dewitt does not challenge any other aspects of the ALJ's decision concerning Dewitt's other physical and mental impairments in her Motion for Summary Judgment.  Any other issues are forfeited.  See Sansone v Brennan, 917 F.3d 975, 983 (7th Cir. 2019).  The Court, therefore, does not address those issues.  Dewitt's attempt to raise other issues summarily in the final paragraph of her reply brief is ineffective.  See Plaintiff's Reply to Commissioner's Memorandum in Support of Motion for Summary Affirmance, at 6-7.  Issues not raised in a party's initial brief and undeveloped arguments are also forfeited.  See United States v. Stadfeld, 689 F.3d 705, 712 (7th Cir. 2012); United States v. Jones, 278 F.3d 711, 717 (7th Cir. 2002); Kelly v. E.P.A., 203 F.3d 519, 522 (7th Cir. 2000).

Dewitt next argues that the ALJ failed to consider whether Dewitt's breathing impairments equaled the Listing 3.04 for cystic fibrosis.  This is incorrect.  The ALJ directly addressed this issue and explained why Dewitt failed to meet her burden to show that her impairments or combination of impairments equaled Listing 3.04.  R. 16.  The ALJ acknowledged that Dewitt had one 6-minute walk test in which her oxygen saturation dropped to 86 percent.  Listing 3.04, however, required two tests in the 12-month period that showed oxygen saturation below 89%, and the tests had to be at least 30 days apart.  All of Dewitt's other 6-minute walk tests had oxygen saturation levels above 89 percent.  The ALJ further noted that Dewitt did not meet Listing 3.04 because she did not have cystic fibrosis, and she failed to show any equivalency because she did not present a required medical opinion of equivalency.  R. 16.  The Social Security Administration requires a medical opinion to establish that a claimant's condition equals a Listing.  SSR 17-2p, 2017 WL 3928306, at *3 (March 27, 2017).  The ALJ considered Listing 3.04.  There was no error.[11]

Dewitt also argues that the ALJ did not consider her breathing impairment in formulating the RFC.  The Court again disagrees.  The ALJ

_____

[11] The ALJ also considered whether Dewitt's breathing impairments equaled Listing 3.02 for impairments other than cystic fibrosis.  R. 18-19.  Dewitt does not challenge the ALJ analysis of the applicability of Listing 3.02.

Page **36** of 37

specifically stated that he included limitations in Dewitt's RFC to address her breathing impairments, "Due to her respiratory impairments, the claimant needed to avoid concentrated exposure to extreme temperatures, wetness, humidity, or pulmonary irritants; some of these environmental factors could also exacerbate some of her other conditions, such as fibromyalgia."  R. 44.  The ALJ included these limitations in his hypothetical questions to vocational expert Hammond.  R. 84.  There was no error.

THEREFORE, IT IS ORDERED that the Defendant Commissioner's Motion for Summary Affirmance (d/e 19) is ALLOWED; Plaintiff Wilma Michelle Dewitt's Motion for Summary Judgment (d/e 16) is DENIED, and the decision of the Commissioner is AFFIRMED.  THIS CASE IS CLOSED.


ENTER:   March 14, 2022

_____s/ *Tom Schanzle-Haskins*_____
TOM SCHANZLE-HASKINS
UNITED STATES MAGISTRATE JUDGE